D. W. DOUGLAS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLIAM E. DOUGLAS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 87419, 87420.   Promulgated June 29, 1938.

*G. O. Carlson, Esq.*, and *Frank Mergenthaler, Esq.*, for the petitioners.

*L. H. Rushbrook, Esq.*, for the respondent.

OPINION.

MELLOTT: In these consolidated proceedings the Commissioner determined that the distribution of certain stock to each of the petitioners in 1933 constituted liquidating dividends, rather than nontaxable distributions made in pursuance of a plan of reorganization, as contended by them. This resulted in the determination of deficiencies in income tax for the year 1933 in the amounts of $11,951.79 and $4,052.22, respectively.

Inasmuch as there is no substantial controversy between the parties as to the facts, most of which were either stipulated or contained in exhibits received in evidence without objection, we may dispense with the making of findings of fact and address ourselves to the questions of law after a brief statement of the essential facts.

The Douglas Co. was a corporation, duly organized under the laws of California during the month of July 1921, with a capital stock of 1,000 shares of the par value of $100 per share. It was engaged in the general business of developing and manufacturing airplanes at Santa Monica, California, the United States Government being practically its only customer. Seventy-five percent of its capital stock was owned by D. W. Douglas, who was also its president, his father, William E. Douglas owning the remaining 25 percent.

The Douglas Aircraft Co. (hereinafter referred to as the new company) was organized in November 1928 under the laws of Delaware, with an authorized capital of 1,000,000 shares of common stock with no par value, for the purpose of acquiring all of the assets of the Douglas Co. D. W. Douglas, by a letter dated November 22, 1928, addressed to some bankers, offered to cause, by proper corporate action of the Douglas Co., a sale or exchange to be made of all of its assets to a new corporation, to be designated "The Douglas Aircraft Co. Inc.", for 200,000 shares of the no par stock of the new company. The 200,000 shares were to be issued to the Douglas Co. or its nominees and the bankers were to purchase an additional 100,000 shares at $10 per share for cash, this, i. e., 300,000 shares, being all of the shares then to be issued. In addition the bankers were to purchase, or cause to be purchased, from petitioners 100,000 shares of the 200,000 shares which were to be delivered to the Douglas Co., for which they were to pay $10 a share.

In the letter of D. W. Douglas to the bankers it was stated:

After the purchases and transfers herein provided for, I agree without further compensation to cause a prompt distribution of the proceeds thereof received by the present company [old company] to myself and my father as the sole stock-

holders thereof and thereafter to deliver or cause to be delivered all of the stock of the present company to the new corporation or its nominee.

The new company was organized and the 300,000 shares of stock were issued. Under date of December 5, 1928, in a letter addressed to the new company, the Douglas Co. offered to sell, assign, transfer, and deliver all of its assets of:

\* \* \* every nature and description which can be assigned by law and will perform for your account the Government contracts now held by this company or which may be hereafter secured in the name of this company, conditional upon your furnishing all machinery, equipment, tools, materials and labor necessary in the performance of said contracts, and paying all liabilities which may arise out of the performance of said contracts, and any and all of them. Without limitation of the generality of the foregoing, we include all machinery, tools, implements, dies, jigs, molds, furniture and fixtures belonging to the undersigned and contained in its factory and building at Clover Field, California, or elsewhere, also the stock and materials of every kind, whether in raw, in manufactured or partially manufactured state, and all trade marks, trade names, patent applications, patents, secret processes, formulae, specifications and drawings of the undersigned and its business as a going concern, in consideration of

(1) The issuance and delivery to the undersigned of 200,000 shares of your no par value common capital stock, full-paid and non-accessable, and

(2) Your assumption of all of the liabilities of the undersigned as shown by the said balance sheet of Ernst & Ernst of December 31st, 1927, and its attached schedules, and all of the liabilities of the undersigned as shown on the balance sheet of The Douglas Company as of November 30th, 1928, attached hereto, and current liabilities incurred in the ordinary course of the undersigned company's business to the date of the transfer, and all of the liabilities which may arise in carrying out the contracts now on hand or which may hereafter be secured for the manufacture and delivery of airplanes by this company to any governmental agency of the United States Government.

The closing of this transaction shall take place in the office of Blair & Company, Inc., New York City, at          o'clock on December 12th, 1928, at which time the undersigned will deliver to you, or upon your direction, proper instruments of assignment, transfer, and conveyance of its assets as specified above against receipt of 200,000 shares of your no par value common capital stock.

This offer was accepted by the new company.

Although it was intended originally, and the contract between the investment bankers and D. W. Douglas contemplated, that a prompt distribution to the stockholders of the Douglas Co., would be made of the 200,000 shares of the new company's stock upon the surrender of their stock in the Douglas Co., two factors were thereafter found which necessitated, according to opinion and advice of counsel, the continuation of the existence of the old company, and the postponement of the completion of the plan until such time as the old company could be legally dissolved. These factors were as follows:

(1) There were disputed claims pending against the Douglas Co. which the new company had not agreed to assume. Subsequently lawsuits were commenced, which had not been settled, tried, or dis-

posed of prior to the date of its dissolution as hereinafter set out. Section 1228 of the Code of Civil Procedure of California, relating to the dissolution of California corporations, at that time provided in part as follows:

Application for dissolution of corporation, what to contain. The application must be in writing, and must set forth:

\*       \*       \*       \*       \*       \*       \*

(2) That all claims and demands against the corporation have been satisfied and discharged.

The pendency of the disputed claims prevented the making of the statement required under the above law and made it necessary that the Douglas Co. remain in existence until the claims were settled, unless the law should be, as it subsequently was, amended.

(2) The contracts between the Douglas Co. and the United States specifically provided that "the contract shall not, nor shall any right to receive payment or any other interest therein, be transferred or assigned by the contractor to any person, firm or corporation." Because of this provision and R. S. 3737 the attorneys advised that the contracts could not be assigned.

Faced with the situation that the Douglas Co. could not be dissolved, as contemplated, and not wishing to abandon the contemplated reorganization, petitioners caused the board of directors of the Douglas Co. to adopt, on December 11, 1928, a resolution, reading in part as follows:

RESOLVED, that a partial distribution of the stock of the Douglas Aircraft Company, Inc., to the extent of 190,000 shares, be distributed to the present stockholders of the Douglas Company when, as and if such shares of the Douglas Aircraft Company, Inc., are issued and received, in proportion to the number of shares that each of the present stockholders of The Douglas Company now own, and that the remainder of said stock, to wit, ten thousand shares, of said Douglas Aircraft Company, Inc., be held in the treasury of this company for further distribution to the stockholders of this company in completion of the plan of reorganization.

BE IT FURTHER RESOLVED, that a proportionate part of 190,000 shares of the stock of the Douglas Aircraft Company, Inc., be issued directly to each stockholder of this company, or his nominee, upon request.

The foregoing plan was carried out. All the assets of the Douglas Co., except the United States Government contracts, were assigned, transferred and turned over to the new company. The new company issued 190,000 of its shares to the petitioners and 10,000 of its shares to the Douglas Co.

The Government contracts were carried out and completed in 1930 by the new company for the account of the Douglas Co. The vouchers were made in the name of the Douglas Co. and checks in payment thereof were made payable to it. All of the checks were endorsed

**1126**

by the officers of the Douglas Co. and turned over to the new company for deposit in its bank account. The Douglas Co. had no other income after November 30, 1928, except dividends upon the 10,000 shares of stock of the new company as follows:

| | |
|---|---:|
| 1930 | $12,500 |
| 1931 | 12,500 |
| 1932 | 8,750 |
| 1933 | 7,500 |
| Total | 41,250 |

These dividends were paid by check of the new company to the Douglas Co. and were immediately endorsed by D. W. Douglas as its president, the proceeds being proportionately distributed to himself and his father. None of the above checks was deposited by the Douglas Co. It had no bank account from December 1, 1928, to December 28, 1933, and kept no books of account during such period.

By 1933 the contracts between the Douglas Co. and the United States Government had been completed and the law of California had been amended to permit the assumption of the liabilities of a dissolving corporation by responsible parties, so nothing then stood in the way of a dissolution of the Douglas Co. Accordingly, in December of 1933, D. W. Douglas having assumed all of the liabilities of the Douglas Co., it was dissolved and its remaining assets, consisting of the 10,000 shares of the new company stock, were distributed proportionately to its stockholders, D. W. Douglas receiving 7,500 and William E. Douglas 2,500.

In the deficiency notices the respondent treats the distribution of the 190,000 shares to the petitioners in 1928 as nontaxable because made pursuant to a plan of reorganization. He says, however, that "* * * the distribution of the 10,000 shares made in 1933, approximately five years later, constituted a liquidating dividend." Accordingly he increased the capital net gain reported by D. W. Douglas $99,310.50 and that reported by William E. Douglas $33,-137.50, these amounts representing the "cash value"—as to which there is no dispute—of the stock which they received. In other words, respondent determined the deficiencies upon the theory and now contends that the reorganization was completely effectuated on December 28, 1928; that everything necessary to complete it was then done; that under the rule enunciated and applied by the Supreme Court in *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378, and *G. & K. Manufacturing Co.* v. *Helvering*, 296 U. .S. 389, it was unnecessary and immaterial that the transferor had not then, and as part of the reorganization, been dissolved; and that when the transferor corporation was dissolved and its assets distributed in a later year—after, as he contends, carrying on business for five years—a distribu-

tion in liquidation under section 115 (c) of the Revenue Act of 1932 [1] occurred.

Petitioners contend that the dissolution of the Douglas Co. and the distribution to them of the 10,000 shares of stock in the new company, although not made until 1933, were nevertheless integral parts in, and took place in pursuance of, the plan of reorganization formulated and partially carried out in 1928; that therefore no gain is to be recognized because of the provisions of section 112 [2] of the Revenue Acts of 1928 and 1932, which, as applicable here, are identical.

While it is true, as pointed out by the respondent, that the courts and this Board have held that the mere fact the transferor corporation was not dissolved after transferring all, or a major portion of, its assets, does not preclude a finding that a reorganization had occurred inasmuch as dissolution is not prescribed by the act, we are of the opinion that the mere application of that rule is not sufficient to solve the present problem. In this connection, however, it should be found as a fact, and we make such a finding, that the transferor did not actually carry on a business during the interim between 1928 and 1933. It was, we think, merely kept alive to comply with the laws of the state under which it was organized and to obviate any possible complications which might arise in connection with its contracts with the United States Government. We have set out above all of the facts upon which this conclusion is based and we are of the opinion that it is fully justified. It is also obvious that the liquidation of the transferor was not completed until 1933, so technically there was a distribution in liquidation during that year. But all of

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. * * *

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—* * *

(b) EXCHANGES SOLELY IN KIND.—* * *

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

* * * * * * *

(i) DEFINITION OF REORGANIZATION.—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), * * *

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

the sections of the revenue act must be construed together. Indeed, the section relied upon by the respondent (115 (c), *supra*) specifically requires that we give consideration to the applicability of section 112; for it provides that the gain "shall be recognized only to the extent provided in" it. This limitation has been recognized in such cases as *Gross* v. *Commissioner*, 88 Fed. (2d) 567, and *North American Utility Securities Corporation*, 36 B. T. A. 320.

We think the conclusion is inescapable that the distribution which was made in 1933 was the "further distribution to the stockholders * * * in completion of the plan of reorganization" which was contemplated when the directors, on December 11, 1928, adopted the resolution referred to above. Nor is there any evidence justifying the conclusion that the petitioners waived their rights to the 10,000 shares or that they accepted the 190,000 shares in lieu of the 200,000 shares which they were to receive in the reorganization. The fact that they ultimately received the number of shares contemplated by their agreement, is, in our opinion, a strong circumstance indicating that they never intended to accept less than that number. The original plan was not changed. The execution of a part of it was merely postponed until it could be carried out in full. In the meantime the petitioners retained their stock in the Douglas Co. Under the circumstances we are of the opinion that the lapse of time is not decisive; and in this connection it may be noted that the act contains no limitation as to time and specifies no time within which an exchange must be made. Stock in a corporation, a party to a reorganization, was exchanged solely for stock in another corporation, also a party to the reorganization, in pursuance of the plan of reorganization, after which, and as a part of the same plan, the stock was distributed to petitioners. This, we think, was sufficient to make it a transaction in which, under section 112, no gain should be recognized.

The action of the respondent is disapproved.

*Judgment will be entered under Rule 50.*