June M. CARLBERG, by Vida M. Frick,
Guardian, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16423.

United States Court of Appeals
Eighth Circuit.

Aug. 12, 1960.

Homer Bruce, Houston, Tex., made oral argument for appellant.

Crombie J. D. Garrett, Atty., Dept. of Justice, Washington, D. C., made oral argument for appellee.

Before SANBORN, MATTHES and ·BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This case, genuine but admittedly test litigation, involves the federal income tax

consequences of one aspect of the statutory merger, effected in November 1956, of The Long-Bell Lumber Corporation, a Maryland corporation, and The Long-Bell Lumber Company, a Missouri corporation, into International Paper Company, a New York corporation, the survivor. These corporate entities will be referred to as "Maryland", "Missouri", and "International", respectively.[1]

The statutes in question are § 368(a) (1) (A), § 354(a) and § 356(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 368(a) (1) (A), § 354(a) and § 356(a).[2]

The government raises no question as to the bona fide business purposes of the merger. The sole issue is whether the "Certificates of Contingent Interest" (as well as the certificates for whole shares and rights in fractional shares of International), received by shareholders of Maryland and Missouri upon the merger, qualify as "stock", within the meaning of § 354(a),[3] or, instead, as "other property", within the meaning of § 356(a) (1).

The litigation takes the form of a suit for refund of income taxes paid by the plaintiff-appellant, hereinafter called the taxpayer, for the calendar year 1956. The government counterclaimed as permitted by § 7422(e) of the 1954 Code. The parties agree that if the sole issue is decided in the taxpayer's favor she is entitled to judgment in the amount of her claim, but that if the issue is decided in the government's favor it is entitled to judgment in the amount of its counterclaim. The case was submitted to the trial court upon the pleadings, a stipulation, and briefs. The government prevailed below.

We endeavor to recite only those factual details which focus attention upon

---

1. The merger was in compliance with the laws of the 3 states involved. Each corporation had been in existence for some time, Missouri since 1884, Maryland since 1924, and International since 1941. Stock of International outstanding at the time of the merger was not directly affected by it.

2. "§ 368. Definitions Relating to Corporate Reorganizations
   "(a) Reorganization.—
   "(1) In general.—For purposes of * * * this part, the term 'reorganization' means—
   "(A) a statutory merger or consolidation; * * *"
   "§ 354. Exchanges of Stock and Securities in Certain Reorganizations
   "(a) General rule.—
   "(1) In general.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
   "(2) Limitation.—Paragraph (1) shall not apply if—* * *
   "(B) any such securities are received and no such securities are surrendered. * * *"
   "§ 356. Receipt of Additional Consideration
   "(a) Gain on exchanges.—

   "(1) Recognition of gain. —If—
   "(A) section 354 * * * would apply to an exchange but for the fact that
   "(B) the property received in the exchange consists not only of property permitted by section 354 * * * but also of other property or money,
   then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of money and the fair market value of such other property.
   "(2) Treatment as dividend.—If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property."

3. The meaning of the term "securities" in § 354(a) and the qualification of the Certificates as "securities", if they are not "stock", are not factors in the case. This is because the Maryland and Missouri stockholders surrendered only stock and thus, in contrast to § 112(b) (3) of the 1939 Code, 26 U.S.C.A. (I.R.C.1939) § 112(b) (3), the limitation of § 354(a) .(2) (B) applies.

the narrow but neatly precise question now before us.

In 1956, prior to the merger, there were outstanding Class A and Class B common stock of Maryland, capital stock of Missouri, and preferred and common stock of International. Under the plan of merger each stockholder of Maryland and each stockholder of Missouri received, in exchange for his shares in those corporations,[4] a certificate for whole shares of common of International and a right to a fractional share of the same common (these whole and fractional shares in the aggregate totalling 849,997) and, as the government in its brief has described it, "a contingent interest in certain reserved shares of such common stock" of International. Specifically, each share, whether Class A common or Class B common of Maryland or capital of Missouri, was converted by the merger into (1) a fractional share of International common and (2), as the government has again described it, a "contingent interest in a fractional share" of International common represented by a "Certificate of Contingent Interest."[5]

The Certificates of Contingent Interest came about in this manner: At the time of the merger Missouri possessed two unresolved but potentially substantial liabilities. One was its possible obligation for unsettled federal income and excess profits taxes for certain past taxable years. The other was litigation pending against Missouri in federal court in the State of Washington. International lacked complete knowledge concerning these matters in controversy and it was

therefore agreed that under the plan of merger, in order to protect International, 49,997 shares of its common, which would otherwise then also have been issued to the shareholders of Maryland and Missouri, would be set aside as "Reserved Shares" pending the determination of these liabilities of Missouri and that Certificates of Contingent Interest would issue with respect to them. As the liabilities would become resolved and as expenses with respect to them would be incurred, the Reserved Shares were to be reduced monthly by charges computed according to a formula based upon quoted values of International common. After all deductions of this kind had been made any remaining Reserved Shares were to be distributed to the then holders of the Certificates.

In summary, then, and to repeat: Each holder of shares in Maryland or Missouri received upon the 1956 merger, in place of those shares, common of International and a Certificate of Contingent Interest. To the extent that his prior holdings in Maryland or Missouri entitled him to whole shares of International common, he received a formal certificate for those shares. He received no certificate for any additional fractional share of International common to which he was entitled but, instead, had a "right" thereto. His Certificate of Contingent Interest was formally issued, was registered, and was transferable.

This particular taxpayer at the time of the merger was the owner of 504 shares of Class A common of Maryland and of 200 shares of capital of Missouri.

4. Excluding shares of Missouri held by Maryland, which were then to "cease to exist", a fact of no consequence here.

5. The trial court, in its unpublished opinion, referred to the conversion of each share of Maryland and Missouri into, in part, a fractional interest in the reserved shares, and three times it observed that these reserved shares were duly issued and "acquired" or "reacquired" by International. The court also stated, "Hence, International Paper Company was the legal owner of such stock, authorized to convey title thereto in liquidation of the

liabilities of Long-Bell." Such acquisition or reacquisition is not supported by the record, and the government in its brief states that "the court was in error in making these statements since the theory of issue and reacquisition was employed solely in clauses" of the merger agreement having to do with dissenting shares and with shares of Maryland Class B common held by Missouri. We therefore accept the fact, as now agreed, that there was no "acquisition" or "reacquisition" of these shares by International.

Upon the merger she received for these stocks certificates for 413 shares of International common, the right to a fractional interest of 3124/100,000 of one share of such common, and Certificates of Contingent Interest for 24.31416 units of contingent interest.

The then value of what the taxpayer received upon the merger exceeded her income tax basis in her Maryland and Missouri shares. The government concedes, however, that the merger was a "statutory merger" under § 368(a) (1) (A) and that the certificates for the 413 whole shares of International common and the right in the fractional share were "stock" which came to her under § 354(a) (1) without recognition of gain. This leaves in controversy only the Certificates of Contingent Interest and the treatment to be accorded them for income tax purposes.

The government's position is that the Certificates constitute a different kind of property than the International common (whole shares and fractional share); that they were, in effect, "boot"; that they do not qualify for the tax free treatment enjoyed by the stock under § 354 (a) (1); and that they are to be treated, instead, under § 356(a) as dividends. The taxpayer contends that the Certificates represent and are nothing other than International common; that while the exact number of shares of that stock ultimately to be forthcoming to the taxpayer was not known in 1956 and could not then be known, because Missouri's potential liabilities were unresolved, that fact cannot and does not negative the Certificates' character as stock; and that, like the whole shares and the fractional

share, they were received under § 354(a) (1) without recognition of gain.[6]

The merger agreement is detailed. It recites generally the pertinent background facts of the 3 corporations and the purposes of International as the surviving corporation; describes International's authorized preferred and common stock; contains the customary information as to principal office, duration, directors and agents for service of process; provides for dissenting shareholders, for capital of Missouri held by Maryland and for shares of Maryland Class B common held by Missouri; and recites facts as to the approval of the merger by the 3 groups of stockholders. It also contains matter of particular concern here:

1. Paragraph IX provides, in each of 3 separate subparagraphs (i, ii, iii) dealing respectively with Maryland's Class A common, Maryland's Class B common, and Missouri's capital stock, that each of these shares outstanding "shall, upon this certificate and these articles becoming effective, automatically and without any action on the part of the holder thereof be converted into and be deemed to be" the stated fraction of a share of International common and "a Contingent Interest in" a stated fraction "of one share of said Common Stock of International Paper Company, to be represented by a 'Certificate of Contingent Interest' in the form annexed hereto * * *," and that each Maryland (or Missouri) certificate "shall thereupon be deemed for all corporate purposes (other than the voting of fractional shares and subject, as regards payment of dividends, to the provisions of clause (v) below and, as to Contingent Interests, subject to the pro-

6. On February 28, 1956, the Commissioner of Internal Revenue was asked to rule upon the proposed merger's federal income tax consequences. A letter-ruling was issued on October 22, 1956 (later formalized as Rev.Rul. 57–586, 1957–2 C.B. 249, 26 C.F.R. 1.356–1). This ruling was to the effect that the merger was a reorganization within the meaning of § 368(a) (1) (A); that the certificates of contingent interest were not to be considered as stock under § 354(a) (1) but,

instead, as "other property" under § 356 (a) (1); that gain, if any, was recognizable not to exceed the fair market value of the certificates; and that that gain, so far as it was not in excess of each stockholder's ratable share of undistributed earnings and profits, was to be treated as a dividend with the remainder, if any, treated as gain from the exchange of property. The government's position here is in line with that ruling.

visions of said Certificate of Contingent Interest) to evidence ownership of the number of fully paid, non-assessable shares of Common Stock and of the Contingent Interests in shares of Common Stock of International Paper Company into which such shares * * * shall have been so converted."

2. Paragraph IX (v) provides that "after this certificate and these articles shall become effective, each holder" of a certificate representing stock of Maryland (or Missouri) "shall surrender the same" to a designated agent of International and be entitled to receive a certificate for whole shares of International common and a Certificate of Contingent Interest; that until that surrender no dividends upon International common shall be paid to the holder, but upon the surrender "the amount of dividends which have theretofore become payable" shall be paid to the person in whose name the certificate of International common is issued; and that "No cash dividends will be paid on the Certificates of Contingent Interest or upon the shares of Common Stock of International Paper Company reserved in respect thereof but certain cash payments in lieu of dividends will be made upon the distribution, if any, of such reserved shares, but only to the extent provided in said Certificates."

3. Paragraph IX (vi) provides that no certificates for fractional shares of International common will be issued on the merger but that Maryland and Missouri shareholders shall have approximately 90 days to sell them or buy fractions to make up whole shares, and that after that period all shares of International common held to cover fractional interests not then combined into whole shares will be sold and holders will then be entitled to receive their pro rata portions of the sale proceeds.

4. Paragraph IX (ix) provides that holders of Certificates of Contingent Interest shall be bound by their provisions and that the form of the Certificate is incorporated in the agreement by reference.

The form of the Certificate is itself pertinent:

1. Its heading, in bold face type, says: "This Certificate Does Not Represent A Right To Any Fixed Amount Of Common Stock Of International Paper Company. Read This Certificate Carefully. This Certificate Is Void 10 Years After Notice Of Distribution Referred To On Back Hereof."

2. It recites that the owner holds a stated number of "Units of Contingent Interest with respect to certain shares of common stock of International Paper Company * * * reserved pursuant to the" merger agreement. It says further that "One Unit of Contingent Interest is being issued for each share of Common Stock * * * so reserved and represents the right to receive * * * IF ANY, of the Reserved Shares * * * as may be distributable ultimately to all registered holders of Certificates * *".

3. It refers to the two "possible liabilities" of Missouri and to International's lack of complete knowledge concerning them and then states that "* * * to protect it against expense and loss on account of either, there have been in effect withheld from the shares which it would otherwise have issued pursuant to the merger" shares of International common; that these shares "are hereinafter referred to as 'Reserved Shares'" and that "This Certificate is issued to evidence the contingent interest which the registered holder hereof has in such number, if any, of the Reserved Shares as may be distributable ultimately."

4. Paragraph 9 of the Certificate reads:

"In the event that prior to any distribution of Reserved Shares (i) there are any changes in the Common Stock of the Corporation through subdivision of shares, stock dividends, or combinations or reclassifications or changes in or elimination of par value of shares, or (ii) as a result of any other recapitalization merger or consolidation said Common Stock is converted into or

exchangeable for any other shares, then in each such case the Reserved Shares then remaining, after all previous deductions made pursuant to paragraph 8 hereof, will be proportionately adjusted, changed, converted or exchanged, as the case may be."

5. Paragraph 10 reads:

"Holders of Certificates will have no rights, by reason of their ownership thereof, as stockholders of the Corporation, including without limitation, no right to receive notices of any meetings of stockholders of the Corporation and no right to vote at any such meetings in respect of the Reserved Shares or otherwise."

6. Paragraph 11 provides for a notice of distribution of the Reserved Shares. Paragraph 12 then reads in part:

"Subject to the further provisions of this paragraph, the distribution provided for in paragraph 11 hereof shall be made pro rata to the registered holders of all outstanding Certificates upon surrender thereof. Upon such distribution each registered holder will be entitled to receive the number of whole shares distributable in respect of the Certificate or Certificates surrendered by him. No fractional shares will be issued on such distribution. In lieu thereof the Corporation will pay a sum in cash equal to the value of the fractional share, * * *

"At the time of distribution of Reserved Shares, the Corporation will pay to each registered holder of a Certificate, upon surrender thereof, cash in an amount equal to the cash dividends which would have been paid in respect of the number of whole shares then distributed to

him had such shares been issued to him on the effective date of the merger".

7. Paragraph 13 provides that all certificates must be surrendered within 6 years after the notice of distribution; that at the expiration of those 6 years International will set aside funds equal to the market value of any then undistributed Reserved Shares, plus "an amount equal to the cash dividends which would have been paid in respect of" such shares had they "been issued on the effective date of the merger"; that upon the surrender thereafter of any outstanding Certificate the holder will receive his proper portion of that fund but without interest and with "no other rights"; and that upon the expiration of 10 years from the notice of distribution any then undistributed funds will be returned to International's general funds free of claims "and all outstanding Certificates shall thereafter be null and void."

In the consolidated balance sheet contained in each of its annual reports for the respective calendar years 1956 and 1957 International did not include the outstanding Certificates of Contingent Interest or the Reserved Shares among its listed capital items or in the supporting detail schedules. The Certificates' existence and purpose, however, were explained in appropriate footnotes. Furthermore, after the merger a 3% stock dividend on International common was declared and an adjustment for this was made in the Reserved Shares.[7]

As the government in its brief states, apparently "the issue in this case has not previously been litigated in any previous case in the non-recognition area".

██ We observe, initially, that the Code does not define the term "stock" as it is used in the reorganization sections.[8]

---

7. While not material here, it is of interest to note that the lawsuit against Missouri was settled in February 1958, that only a part of the settlement payment was applied against the Reserved Shares, and

that as of February 28, 1958, the number of the Reserved Shares was 39,560.

8. The original or House version of H.R. 8300 which emerged as the 1954 Code did attempt certain definitions. The Sen-

Neither do the Regulations.[9] In the absence of definitive help from these sources the term deserves only its ordinary meaning. See Deputy v. Du Pont, 308 U.S. 488, 498, 60 S.Ct. 363, 84 L.Ed. 416, and Commissioner v. Neustadt's Trust, 2 Cir., 131 F.2d 528, 530.

■ Certain other principles merit mention. The situation at the time of the merger and not that as of any later date is controlling or, as the Supreme Court has said, "The critical time is the date of the exchange". Helvering v. Southwest Consol. Corp., 315 U.S. 194, 201, 62 S.Ct. 546, 551, 86 L.Ed. 789. Also, the taxpayer has the burden of proof both as to her claim, Niles Bement Pond Co. v. United States, 281 U.S. 357, 361, 50 S.Ct. 251, 74 L.Ed. 901, and, by § 7422(e), as to the government's counterclaim. We also recognize, on the other hand, that delay in the distribution of the Reserved Shares, that is, the mere lapse of time between November 1956 and the ultimate distribution of those shares, is apparently immaterial and not of itself fatal to their qualification as stock under § 354(a) (1). Fry, 5 T.C. 1058, 1071; McAbee, 5 T.C. 1130, 1150; Douglas, 37 B.T.A. 1122, 1128; Spang-

ler, 18 T.C. 976, 984. Finally, while the name "Certificate of Contingent Interest" may not, in the light of the present litigation, have been the most apt or fortunate one to use, the name itself, of course, cannot determine ultimate rights and is not controlling. Cf. McAbee, supra.

We look first at what the corporate parties to the reorganization were trying to do. This is apparent. They were endeavoring to transfer the operation, as the government in its letter-ruling of October 22, 1956, described it, of an "integrated lumber business" (Missouri) and of "a holding company" (Maryland) to International which "is engaged directly and through its subsidiaries primarily in the manufacture and sale of various types of pulp and paper products" and which "presently has no timber operation and owns no timber properties west of the Rocky Mountains". And, as the ruling also said:

"The directors of these corporations have concluded that the proposed transaction, if effected, will combine diversified but complementary experiences, skills and properties, and will provide a product and

ate, however, rejected these saying, in Report No. 1622, 83rd Congress, 2d Session, p. 42,

"Your committee believes that any attempt to write into the statute precise definitions which will classify for tax purposes the many types of corporate stocks and securities will be frustrated by the numerous characteristics of an interchangeable nature which can be given to these instruments. Accordingly, your committee has returned to the use of the terms 'stock', 'common stock', 'securities', etc., and, as is the case under existing law, has not attempted to define them in the statute." ▲

The Senate version prevailed at conference. Report No. 2543, p. 34.

Some attempts at positive or negative definitions of "stock" are embraced in other sections of the 1954 Code. See, for example, § 306(c), § 382(c), § 1083 (f), § 1504(a) and § 7701(a) (7). These appear to be limited in their application or negative in nature and of no significance for our present problem. Compare § 305(a) and § 317(a).

**9.** § 1.354–1(e) of the Regulations under the 1954 Code does state that for the purpose of § 354 "Stock rights or stock warrants are not included in the term 'stock or securities.'" This negative definition, however, is questioned in Rabkin and Johnson, Law of Federal Income, Gift and Estate Taxation, Vol. 2, § 31.-04(7).

It is of interest to note that the present Regulations, when in proposed form, attempted a definition in § 1.317–4:

"In general, the term 'stock', for purposes of this sub-chapter, includes all forms and classes of instruments representing the interest of owners of the equity interest in the corporation as distinguished from instruments representing the claim of persons whose relationship with the corporation is similar to that of creditors, generally referred to as 'securities'."

This, however, did not appear in the final form as promulgated by T.D. 6152, 1955–2 C.B. 61, 20 F.R. 8875.

geographic diversification not now enjoyed by the corporations operating separately."

But the existence of the Missouri liabilities, unresolved and potentially substantial as they were, hung over the proposal and presented a problem to International, to Missouri and, because Maryland possessed a substantial interest in Missouri, to Maryland as well. The solution and result was the device of the Reserved Shares. Its purpose thus was to protect International, to the extent it felt protection necessary, from these Missouri liabilities and to place their ultimate burden exactly where it belonged, viz., on the Missouri stockholders.[10] Had the amount of those liabilities been known with specificity at the time of the merger there would have been no reason at all for the Reserved Shares, and a net number of shares, in addition to the original 849,997, or none at all, would then have been distributed to the Maryland and Missouri stockholders. Unquestionably, their receipt of such additional shares, had it taken place at that time, would have been free of recognized gain under § 354(a) (1) just as the 849,997 shares were so received. Why, then, should there be a difference in result because of the device of the Reserved Shares?

The government's answer to this question comprises its posture on this appeal. It argues that the 1954 Code effected a narrowing from the 1939 Code in the area of corporate reorganizations resulting in tax free exchanges and a corresponding broadening of the taxable concept of "other property". [Compare 1954's § 354(a) (2) with 1939's § 112(b) (3) ]. It points out that the agreement and the Certificate contain provisions and prescribe characteristics for the Certificate which do not conform to the usual concept of corporate stock. Specifically, it emphasizes that the agreement provides that no cash dividends are payable on the Certificates or on the Reserved Shares but that payments "in lieu of dividends", although in amount equivalent thereto, will be made upon the distribution of the Reserved Shares; and that each holder is bound by the provisions of the Certificates. The government also notes that the Certificate itself denies that it represents a right to any fixed amount of common stock and asserts that if the Certificates are not surrendered within a prescribed time the sole distribution will be in cash and that the Certificate even becomes void 10 years after notice of distribution. It argues that these Certificates "will have to be converted into stock at some later date if ever"; that the Certificate is a contract independent of that between International and its stockholders with respect to its stock; that it is not known whether the Certificate holder will ever receive International common; that the Certificates are mere contracts to issue stock in the future under certain circumstances; that the Reserved Shares were not issued and outstanding; that paragraph 10 of the Certificate thrice denies stock characteristics; that the taxpayer by doing nothing eventually will get only cash; that because the Certificates are independently traded they have an intrinsic value separate and distinct from the value of International common; and that the taxpayer by the Certificates acquired something more than stock, or at least something different, and that this was "boot" and taxable. The government also relies on International's failure to reflect the Certificates among the liabilities listed in its balance sheet. All these factors, says the government, impinge on the normal rights of a holder of stock and thus show that the taxpayer's interest, while it may have value and while it may be a property interest, is not stock but is "other prop-

---

10. The government in its brief describes it as follows: "The propose of their issuance clearly was to avoid the dilution of International Paper stock to the detriment of its holders and to preserve the investment of erstwhile holders of The Long-Bell Lumber Corporation stock vis-a-vis liabilities of The Long-Bell Lumber Company assumed by International Paper."

erty" within the meaning of § 354(a)(1).

The taxpayer asserts that the Certificates of Contingent Interest, like certificates for whole shares, are not the shares themselves but are merely evidence of a stock interest, citing United States Radiator Corp. v. State, 208 N.Y. 144, 101 N.E. 783, 785, 46 L.R.A.,N.S., 585; Eisner v. Macomber, 252 U.S. 189, 208, 40 S.Ct. 189, 64 L.Ed. 521; Swobe v. Brictson Mfg. Co., 8 Cir., 279 F. 560, 562; Federal Deposit Ins. Corp. v. Gunderson, 8 Cir., 106 F.2d 633, 634, and other cases. She also takes comfort from both the merger agreement and the Certificate. She emphasizes the agreement's provision that upon its becoming effective the outstanding Maryland and Missouri stocks shall "automatically and without any action on the part of the holder thereof be converted into and be deemed to be" stock of International and "a Contingent Interest" in a fraction of one share of such stock "to be represented by a Certificate of Contingent Interest." She also points out that the caveat of the Certificate is directed only to "any fixed amount" of International common and does not at all negative her right in such common; that the Reserved Shares are shares "which it would otherwise have issued pursuant to the merger"; that the Certificate protects the Reserved Shares with respect to subdivision, stock dividends, reclassifications, other recapitalization, merger or consolidation; and that they are also protected with respect to interim dividends by the payments made at distribution. The taxpayer emphasizes that the government itself has characterized the Certificate as "a Contingent Interest" in a fractional share of International common and as "representing an interest in stock" and she argues that the interest represented by the Certificate is not something different in kind than she had before the reorganization and that it therefore cannot be "boot". She asserts that Paragraph 10 is not embarrassing to her because its language of limitation is directed to ownership of the Certificate and does not affect her basic rights as a stockholder. She notes that with respect to the fractional share, which the government has conceded was received tax free, there are parallel provisions in the merger agreement relating to sale and the like, when surrender is delayed, and yet these provisions do not affect the qualification of the fractional share as "stock". She also notes that while International may not have reflected the Reserved Shares in its list of capital items in the two annual reports, there were protective footnote provisions there and that, more important, the Reserved Shares received the full benefit of the 3% stock dividend declared after November 1956, and she says that in any event what International does or does not do cannot effect binding tax results on the taxpayer.

Both parties place some reliance upon the implications of Helvering v. Southwest Consol. Corp., 1941, 315 U.S. 194, 62 S.Ct. 546, 548, 86 L.Ed. 789, supra. The problem there was whether a transaction qualified as a "reorganization" under § 112(g) (1) (B) of the Revenue Act of 1934, which included in the definition of reorganization "the acquisition by one corporation, in exchange solely for all or a part of its voting stock * * * of substantially all the properties of another corporation". A corporate taxpayer in 1934 had acquired the assets of another corporation in exchange for its own voting common and Class A and Class B stock purchase warrants. The warrants carried the right to buy common at specified prices which increased as time passed until the right expired in 1938. The court said, at pages 198–199 of 315 U.S., at page 550 of 62 S.Ct.:

"Congress has provided that the assets of the transferor corporation must be acquired in exchange 'solely' for 'voting stock' of the transferee. 'Solely' leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement. * * *"

and that, with one exception,

" * * * the requirements of § 112(g) (1) (B) are not met if

properties are acquired in exchange for a consideration other than, or in addition to, voting stock. Under that test, this transaction fails to qualify as a 'reorganization' under clause B."

The Southwest case thus may be taken as standing for the proposition that the word "solely" in these reorganization provisions of our income tax laws is to be interpreted literally. To say this, however, is to add nothing helpful upon the issue before us, for our question accepts that standard and is now concerned only with the interpretation of the word "stock". The court, however, went on to say, at pages 200–201 of 315 U.S., at page 551 of 62 S.Ct.:

"In the second place, the warrants which were issued were not 'voting stock'. Whatever rights a warrant holder may have 'to require the obligor corporation to maintain the integrity of the shares' covered by the warrants * * * he is not a shareholder. * * * His rights are wholly contractual. As stated by Holmes, J., in Parkinson v. West End Street Ry. Co., 173 Mass. 446, 448, 53 N.E. 891, 892, he 'does not become a stockholder by his contract in equity any more than at law.' At times, his right may expire on the consolidation of the obligor corporation with another. Id. If at the time he exercises his right there are no authorized and unissued shares to satisfy his demand, he will get damages, not specific performance. * * * Thus he does not have, and may never acquire, any legal or equitable rights in shares of stock. * * * And he cannot assert the rights of a shareholder. * * * Accordingly, the acquisition in this case was not made 'solely' for voting stock."

It is in this language that the parties claim differing support. The government argues that this quotation is particularly pertinent here, that the taxpayer is in the same situation as the warrant holder in Southwest, that her rights are "wholly contractual" and that she cannot assert the rights of a stockholder. The taxpayer points out that the Southwest warrants provided rights to purchase shares at stated prices during a stated time and that the holders had only an option to purchase stock, but that, in contrast, the Certificate holders here were immediately entitled to all the Reserved Shares that might be distributed and needed to take no positive action whatsoever and certainly needed to provide no additional consideration.

The taxpayer also cites the McAbee case, supra, 5 T.C. 1130 (in which the government acquiesced, 1946–2 C.B. 4), as supporting her position. In that case, shares issued by an acquiring corporation were deposited in 1933 with a bank in escrow to protect that corporation against liabilities of the acquired corporation. Each stockholder of the latter received a "Certificate of Beneficial Ownership" reciting the purpose of the escrow and the anticipated delivery of the deposited shares in two later years. It also stated that dividends on the escrow shares would be paid out to the certificate holders. The certificates were assignable. The government claimed that shares delivered out of escrow in 1937 were received as a liquidating dividend of the acquired corporation and were taxable income. The Tax Court held, however, that they had been received by the taxpayer in 1933 as a part of the tax free reorganization in that year under § 112(i) (1) (A) of the Revenue Act of 1932 and said, at page 1150:

"In our opinion the Hemingray stockholders acquired equitable title to the Owens stock in 1933 when it was placed in escrow for their benefit. Thereafter the stock was held merely as security for the performance by Hemingray of its agreement to pay its obligations."

The taxpayer here claims that any differences between McAbee and the instant case are immaterial and that even though dividends were payable currently on the deposited stock, that stock, as here, could be returned to the acquiring

corporation if the escrow obligations were not fulfilled. The government would distinguish the case on the ground that the certificate holders there owned stock and a specific number of shares thereof, that they received dividends, that the stock was issued and outstanding, and that the escrow was to last a definite and not an indeterminate time.

Both these arguments are strong and we recognize their pertinency. We feel, however, that while the Southwest and McAbee cases are helpful, neither is conclusive here. Certainly, as the taxpayer points out, there are obvious differences between the Southwest warrants and our Certificates of Contingent Interest and, as the government points out, there may well be significant factual distinctions between McAbee and the situation now before us. We also feel that the merger agreement and the provisions of the Certificates are properly interpreted and analyzed not alone within the limitations of their language (possible conflicting results as to which are well illustrated by the arguments of the opposing litigants here) but in the light of other and deeper considerations, namely, purpose, practicality, precedent and substance. We turn to these in order.

1. *Purpose.* The purpose of the reorganization sections and the purpose of this merger are significant factors. Generally, under our income tax laws, the entire amount of gain realized on the sale or exchange of property is recognized and taxed, §§ 1002, 1001, 61(a) (3), 63 and 1 of the 1954 Code. However, there are certain exceptions to this. Among these is § 354(a)'s provision with respect to corporate reorganizations. § 1.368–1(b) of the Regulations, issued with respect to

§ 368 of the 1954 Code, is entitled "Purpose". It states the general rule of taxability of gain upon exchange of property but then says,

> "The purpose of the reorganization provisions of the Internal Revenue Code is to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms." [11]

This appears to be a current expression of what has been said in other words by the Supreme Court in opinions concerning earlier Revenue Acts:

> "But to do so would be to ignore the purpose of the reorganization sections of the statute, which, as we have said, is that where, pursuant to a plan, the interest of the stockholders of a corporation continues to be definitely represented in substantial measure in a new or different one, then to the extent, but only to the extent, of that continuity of interest, the exchange is to be treated as one not giving rise to present gain or loss." Groman v. Commissioner, 302 U.S. 82, 89, 58 S.Ct. 108, 112, 82 L.Ed. 63.

See also Nelson Co. v. Helvering, 296 U.S. 374, 377, 56 S.Ct. 273, 80 L.Ed. 281; G. & K. Mfg. Co. v. Helvering, 296 U.S. 389, 391, 56 S.Ct. 276, 80 L.Ed. 291. Assuming, as we must in the light of the government's concession, that the necessary "business exigency" and a "readjustment of continuing interest in prop-

---

11. Mertens, Law of Federal Income Taxation, Vol. 3, § 20.55, pp. 160, 165, puts it this way:

"The justification for the exemption from taxation of gains realized in corporate reorganizations is that the parties making the exchanges have simply changed the form of their corporate holdings and that what was formerly a corporate business carried on by a particular corporation, or corporations, in a particular corporate form, or forms, is to be now carried on and continued by other and perhaps new corporations having new corporate form. * * *

"* * * the purpose of the reorganization sections, as pointed out by the courts, was to relieve from tax cases in which corporations might wish to consolidate or divide, or add to, or subtract from their holdings."

erty under a modified corporate form" are both present here with respect to the whole and fractional shares of International common, we fail to see why, in line with these expressed purposes, the same conclusion does not follow with respect to the Certificates of Contingent Interest. Certainly the Certificates here provide "continuity of interest" in the surviving corporation just as do the taxpayer's whole shares and fractional share. The Certificates can produce nothing other than stock and nothing other than a continuity of interest. The Certificates therefore fit the expressed basic purpose of the tax free provisions of the reorganization sections.

2. Practicality. The practical and realistic aspects of the situation are also persuasive. The parties here were confronted with the problem of Missouri's potential liabilities. They were faced with the necessity of affording some protection to International with respect to those liabilities and, at the same time, of effecting the desired statutory merger with the consequent business benefits which it was felt would result therefrom. The concept of the Reserved Shares seems to have been an ideal and logical one to solve the problem of these contingent liabilities. While it protected International, at the same time it preserved for the stockholders of Maryland and Missouri the right to their respective portions of any additional shares of International to which they were entitled. Furthermore, it did this in a fair and precise manner by measuring that interest by the eventual outcome of the tax and litigation controversies. Had they chosen to do so, the parties to the reorganization could have resolved the problem arbitrarily by distributing outright something less than the 49,997 Reserved Shares to the Maryland and Missouri stockholders in 1956 at the time of the merger and by letting International then take the benefit or the detriment of any ultimate difference. That the fairer and more exact method was chosen should not result in unfavorable tax consequences.

We emphasize also that, however one may choose to describe it, the Certificate of Contingent Interest represented only International common and nothing else. What the holder possessed was either stock or it was nothing. The number of shares to be forthcoming, it is true, was not determined with exactitude at the time of the merger but that fact does not change the character of the interest. And to argue that because it traded independently of International's whole shares proves that it is something apart from the stock is, we think, an unrealistic appraisal of the significance of market action.

3. Precedent. The precedent of the tax treatment of the fractional share is embarrassing to the government's position. While some of the provisions of the merger agreement and of the Certificate may seem to impinge upon what are regarded as customary and normal attributes of ownership of stock, we regard these as compelled by the practical necessities of the situation here and as not affecting or diminishing the inherent stock character of what the taxpayer received or as granting her different or additional non-stock rights. We are impressed by the fact that similar impingements, for example, voting limitations and the possibility of their being sold after 90 days, are present and equally applicable to the fractional shares but have not been regarded by the government as fatal to the qualification of those fractional shares as "stock" within the meaning of § 354(a) (1), and to their consequent tax free character upon receipt by the Maryland and Missouri stockholders.

4. Substance. It has often been said in tax arguments, and occasionally decided, see Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981; Kanawha Gas & Utilities Co. v. Commissioner, 5 Cir., 214 F.2d 685, 691, that substance must prevail over form. If this observation has any independent legal force or merit in the determination

of tax causes, it compels a conclusion that the substance of the Certificates equates only with stock of International. The rule of substance over form, therefore, this time operates in the taxpayer's favor.

For these reasons of purpose, practicality, precedent and substance, we hold that the property interest represented by the Certificates of Contingent Interest in this reorganization is "stock" within the meaning of § 354(a) (1) rather than "other property" within the meaning of § 356(a) (1) or "boot" and that the Certificates' receipt by the taxpayer in 1956 did not result in recognized income to her.

Reversed with directions to enter judgment for the plaintiff in the amount of her claim.