Preston Wilson, et al. [1] v. Commissioner. Wilson v. Commissioner
Docket Nos. 69202, 70407, 71026, 71027.
United States Tax Court
T.C. Memo 1961-135; 1961 Tax Ct. Memo LEXIS 215; 20 T.C.M. (CCH) 676; T.C.M. (RIA) 61135; May 16, 1961
Benedict Krieger, Esq., for the petitioners. Arthur Pelikow, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion In these consolidated proceedings the Commissioner determined deficiencies in petitioners' income tax, excess profits tax, declared value excess profits tax, and additions to tax as follows: Preston Wilson - Docket No. 69202
Additions to Tax
Income
Sec. 293(a),
Year
Tax
I.R.C. 1939
1950
$65,231.99
$ 3,261.60
Laurence Investment Co., Inc. - Docket No. 70407
Additions to Tax
Income
Sec. 293(b),
Year
Tax
I.R.C. 1939
1935
$ 176.94
$ 88.47
1936
103.02
51.51
1937
98.79
49.40
1938
182.07
91.04
1939
158.59
79.30
1940
235.68
117.84
1941
186.14
93.07
1942
756.15
378.08
1943
527.38
263.69
1944
501.95
250.98
1945
502.99
251.50
1946
529.66
264.83
1947
720.00
360.00
1948
792.19
396.10
1949
707.62
353.81
1950
10,903.23
5,451.62
*216 Additions to Tax
Excess
Sec. 293(b),
Year
Profits Tax
I.R.C. 1939
1935
$ 67.73
$ 33.87
1936
73.33
36.67
1937
66.13
33.07
1938
130.44
65.22
Declared
Additions to Tax
Value Excess
Sec. 293(b),
Year
Profits Tax
I.R.C. 1939
1939
$ 104.83
$ 52.42
1940
163.04
81.52
1941
58.76
29.38
1942
157.72
78.86
1943
115.82
57.91
1944
167.32
83.66
1945
263.86
131.93
Wilson Holding Company - Docket No. 71026
Additions to Tax
Income
Sec. 293(b),
Year
Tax
I.R.C. 1939
1950
$52,193.59
$26,096.59
Jaham Holding Company, Inc. - Docket No.
71027
Additions to Tax
Income
Sec. 293(b),
Year
Tax
I.R.C. 1939
1951
$ 6,707.06
$ 3,353.53
1952
3,593.25
1953
3,776.30
In his answer to petitioner Preston Wilson's amended petition, the Commissioner for the first time alleged that an addition for fraud in the amount of $32,616 under Section 293(b) of the 1939 Code is due from the individual petitioner for the taxable year 1950 in place of the addition for negligence under Section 293(a) determined in the deficiency notice. The issues divide themselves *217 into three main groups. First, was there a tax-free reorganization when Wilson Holding Company transferred substantially all its assets to Jaham Holding Company, Inc. in 1950 and Jaham subsequently distributed its voting stock to the Wilson Holding Company stockholders? If not, what was the amount of the gain if any which was realized by the parties to these transactions, and was the failure of the parties to report such gain, if any, due to fraud with intent to evade tax? Secondly, were certain expenses claimed by Jaham Holding Company, Inc. in the years 1951, 1952, and 1953 proper business deductions, including an alleged leasehold expense in 1951 which the Commissioner claims was fraudulently deducted? Third, was Laurence Investment Co., Inc. the taxable owner of income producing real estate at 305 Main Street, Hackensack, New Jersey, from 1935 through 1950? If so, what was the amount of the net taxable income from this source which Laurence failed to report in each of the years in question and was this failure in each year due to fraud with intent to evade tax? Findings of Fact The stipulated facts are incorporated herein by this reference. Preston Wilson is an individual *218 with residence at 1637 Buckingham Road, Teaneck, New Jersey. For the calendar year 1950 he filed his individual income tax return with the collector of internal revenue at Newark, New Jersey. Laurence Investment Co., Inc., hereinafter called Laurence, is a New Jersey corporation engaged in the renting, purchasing, and selling of real estate which filed its corporate income tax returns for the taxable years 1935 through 1950 using an accrual method of accounting with the collector of internal revenue at Newark, New Jersey. During the years in question, all of the outstanding stock of Laurence was owned by Samuel Hekemian and his immediate family. Wilson Holding Company, hereinafter called Wilson Co., is a real estate corporation organized under the laws of the State of New Jersey on August 27, 1935. It filed its corporate income tax return for the calendar year 1950 using an accrual method of accounting with the collector of internal revenue at Newark, New Jersey. Prior to February 10, 1950, the shareholders of record of Wilson Co. were as follows: Stockholder of Record
No. of Shares
Preston Wilson
27
Maud Wilson
4
Laurence Investment Co., Inc.
27
Elizabeth Hekemian
4
Total
62
*219 Maud Wilson is the wife of Preston Wilson. Elizabeth Hekemian is the wife of Samuel Hekemian. Jaham Holding Company, hereinafter called Jaham, was organized on February 27, 1936, under the laws of the State of New Jersey as a real estate corporation. It filed its corporate income tax returns for the calendar years 1951, 1952, and 1953 using an accrual method of accounting with the director of internal revenue at Newark, New Jersey. Prior to February 10, 1950, Jaham's shareholders of record were as follows: Stockholder of Record
No. of Shares
John and Alice Aslanian, As-
signees of Jacob Hammalian
21
Samuel Hekemian, Assignee of
Bertha Bodner
21
Jacob Hammalian
3
Jaham Treasury
3
Total
48 John and Alice Aslanian are husband and wife. Alice is Samuel Hekemian's sister. Jacob Hammalian is an old friend and business associate of Samuel Hekemian but is not related to him by blood or marriage. 1. Merger of Wilson Co. and Jaham. Prior to February 10, 1950, the only asset of substantial value which Wilson Co. owned was a corner piece of real estate, consisting of land and building together with a rear parking lot, at 320-322 Main Street, Hackensack, New Jersey. *220 The adjoining building and property at 324 Main Street was owned by Jaham. Both properties were managed for the corporations by the New Jersey real estate corporation of S. Hekemian & Company, Inc. which had its office in the Jaham building. Samuel Hekemian is president of the latter firm and was the dominant figure in the various transactions here involved. In the Wilson Co. building Preston Wilson operated a bicycle business and his son operated a boat business; Preston and Maud Wilson also resided in an apartment in that building. Several other tenants occupied the business and living facilities in the Wilson Co. and Jaham buildings. Sometime prior to November, 1949, Oppenheim Collins New Jersey, Inc., hereinafter called Oppenheim Collins, became interested in leasing the adjacent Wilson Co. and Jaham properties for the purpose of constructing a building in which to operate a department store. However, since Oppenheim Collins insisted on dealing with only one landlord rather than two, it became necessary to have the titles to both properties placed in a single ownership if the lease were to be obtained. Accordingly, the stockholders of Wilson Co. and Jaham met together several *221 times in November and December of 1949 to consider, among other things, the feasibility of some kind of a merger in order to obtain the lease with Oppenheim Collins. The discussions, which were not recorded at the time, dealt with the needed property conveyance, the method of payment, the proposed lease, and the relocating of the tenants who then occupied the two buildings. These meetings and discussions resulted in an agreement that Wilson Co. would convey its property to Jaham and Jaham would then make the lease with Oppenheim Collins. It was also agreed, though the details were not then worked out, that Jaham would distribute shares of its stock to Wilson Co. or Wilson Co. stockholders so that the stockholders of Wilson Co. would end up with approximately two shares of Jaham stock for every one share then held by the Jaham stockholders. This agreement was not reduced to writing when made. As a result of this agreement Wilson Co. executed a deed to Jaham on February 10, 1950, which conveyed title to the former's Main Street property subject to three outstanding mortgages. This deed was recorded on March 3, 1950, in the Office of the County Clerk, Bergen County, New Jersey. The *222 property thus conveyed constituted substantially all of Wilson Co.'s assets. Also on February 10, 1950, Jaham leased to Oppenheim Collins the property at 320-324 Main Street and the abutting land in the rear thereof "together with the buildings now erected and to be erected". The leased premises consisted of the real estate formerly owned by Wilson Co. and Jaham separately. The term of the lease was to commence on February 10, 1950, and end on July 31, 1980, with an option to renew for an additional 15 years. The lease provided that the landlord was to deliver the demised premises to the tenant free of tenancies on or before March 1, 1950, and the tenant undertook as soon as feasible after delivery of the demised premises to demolish the existing buildings and construct a new building suitable for the tenant's use as a retail department store, substantially in accordance with the preliminary plans and specifications dated February 7, 1950, prepared by the tenant's architect. In connection with the construction of such new building, the tenant was given the right in its sole discretion to use existing foundations and to use any materials salvaged from the existing buildings. *223 Other provisions of this lease are as follows: The Tenant will pay the cost of such work and the Landlord will pay to the Tenant toward the cost of such work the sum of One hundred and fifty thousand dollars ($150,000.00) within fifteen (15) days after the tenant shall give the landlord written notice of completion of construction. The time of completion of construction shall be the date certified to by the Tenant's architect, but not later than December 31, 1950. The Tenant shall deliver to the Landlord at or prior to the time for payment by the Landlord of said sum of One hundred and fifty thousand dollars ($150,000.00) a Certificate of Occupancy issued by the appropriate Municipal authorities. The Tenant shall pay to the Landlord "interim rent", in lieu of all other rent hereunder, at the rate of Twelve hundred and fifty dollars ($1250.00) per month (pro-rated for part of a month) on the last business day of each and every month during the period commencing on the date that the landlord delivers the demised premises to the Tenant free of tenancies and occupants * * * and ending on the date when permanent rent commences * * * The Tenant shall pay to the Landlord "minimum rent", *224 commencing as hereinafter provided, at the rate of Thirty Thousand dollars ($30,000.00) per annum, in equal monthly instalments of Twenty-five hundred dollars ($2500.00) on the first business day of each and every month during the term hereof. In addition, the Tenant shall pay to the Landlord as "percentage rent", commencing as hereinafter provided, a sum equivalent to three per cent (3%) of the "net sales" (as hereinafter defined) made by the tenant in the demised premises, in excess of One million dollars ($1,000,000.00) during each lease year, as hereinafter defined. In addition, the Tenant shall pay as "additional rent", commencing as hereinafter provided, as the same becomes due and payable (a) real estate taxes, assessments and water charges levied or assessed on the demised premises, and (b) insurance premiums on policies as follows: (i) fire insurance with extended coverage, covering the Landlord, the Tenant, and any mortgagees designated by the Landlord against loss by fire for the full insurable value of the buildings and improvements (exclusive of foundations) on the demised premises, (ii) rent insurance, covering the Landlord, in the amount of the minimum rent and additional *225 rent hereunder, (iii) plate glass insurance covering the plate glass in the demised premises, and (iv) liability insurance insuring the Landlord and the Tenant in the amount of One hundred thousand dollars ($100,000.00) in respect to injuries or death to any one person, and in the amount of Two hundred thousand dollars ($200,000.00) in respect to any one accident or disaster. The Tenant shall take good care of the demised premises and shall at the Tenant's own cost and expense make all necessary repairs to the interior and exterior of the demised premises and shall prevent, abate and correct any nuisances, including the sidewalk, parking area, driveways and curbing, whether structural, ordinary or extraordinary, except as may be otherwise provided in Article "10" hereof. The Tenant will at the end or other expiration of the term deliver up the demised premises in good order and condition, ordinary use, wear, tear and damage by fire or other casualty and the elements excepted. No action was taken on February 10, 1950, or immediately thereafter to transfer Jaham stock to Wilson Co. or its stockholders. However, the Jaham lease with Oppenheim Collins was signed for Jaham by Preston *226 Wilson, the president of Wilson Co. and acting in the capacity of the newly elected president of Jaham. On March 15, 1950, Preston Wilson and his personal counsel, an attorney named Carlsen, visited the offices of S. Hekemian Company, Inc. for the specific purpose of taking steps to formalize the merger of Wilson Co. and Jaham. Wilson, Samuel Hekemian, and Hekemian's counsel, Milton Najarian, all of whom had taken part in the pre-conveyance discussions, informed Carlsen of the agreements which had been reached at the prior meetings and of the matters which remained undone as of that date. Carlsen suggested that an informal trust receipt signed by Jaham would be an appropriate interim measure to protect the interests of all the parties. Carlsen immediately drafted and personally typed out such a trust receipt which Preston Wilson signed in behalf of Jaham. It read as follows: WHEREAS, JAHAM HOLDING COMPANY, INC., a Corporation of the State of New Jersey, has heretofore taken title to certain properties of WILSON HOLDING CORPORATION, INC., a Corporation of the State of New Jersey, which properties are bounded on the East by River Street, on the South by Berry Street and on the West *227 by Main Street, all in the City of Hackensack, County of Bergen and State of New Jersey, And WHEREAS, said transaction has taken place in order to facilitate negotiations for the construction of a new building upon said properties together with properties of the said JAHAM company and the leasing of said building for occupancy by Oppenheim Collins department store, And WHEREAS, said Jaham company and Wilson corporation have not as yet determined the basis upon which payment shall be made for said transfer of titles, NOW THEREFORE, it is herein stipulated and agreed by JAHAM HOLDING COMPANY, INC., that it holds titles to said properties transferred as aforesaid by WILSON HOLDING CORPORATION, INC., as trustee for the said Wilson corporation and as such trustee it will do nothing further from this date on to encumber said titles without the unanimous consent of all stockholders of said Wilson corporation until such time as said stockholders shall unanimously agree as to what further disposition shall be made in the premises and particularly as to compensation to be paid either in stock or in cash for the conveyances of said titles to Jaham, it being understood however that Jaham *228 shall agree as to the amount and method of compensation, otherwise said titles are to be reconveyed to the Wilson corporation. IN WITNESS WHEREOF, the undersigned has caused this agreement to be signed by its proper corporate officials and its seal to be affixed hereto this 15th day of March, 1950. JAHAM HOLDING COMPANY, INC. By /s/ Preston L. Wilson President Attest: /s/ Elizabeth Hekemian (SEAL) Jaham Trust Receipt Nothing further was done to adjust the interests of the parties to the merger during the remainder of 1950. Jaham saw to it that the tenants of the two buildings were relocated so that Oppenheim Collins could begin the construction of its new building on schedule. The old buildings were in part demolished, though the foundations and some of the steelwork were incorporated into the new structure. The new building was finished and occupied by Oppenheim Collins in October or November of 1950. On July 1, 1950, Jaham leased the parking area behind the new Oppenheim Collins department store to Wilson Co. for a term of ten years at an annual rental of $4,200 to be paid in equal monthly installments of $350 per month. The purported purpose of this lease was to *229 allow Wilson Co. to operate a parking lot in this parking area during the period of construction of the Oppenheim Collins store and, after the store opened, on the days when the store was not open for business. No money was ever paid under this lease. The lease was created for the sole purpose of being used as additional security by Jaham in applying for a mortgage loan on the new Oppenheim Collins store. Jaham applied for a $300,000 loan and was granted a $285,000 loan by the New York Life Insurance Company on November 1, 1950. Of this amount, Jaham paid $150,000 to Oppenheim Collins as its contribution toward the building cost of the new building pursuant to the lease signed on February 10, 1950. Early in 1951 a meeting took place at the attorney Carlsen's office attended by Preston Wilson, Samuel Hekemian, Milton Najarian, O. L. Sanborn, an accountant who worked for S. Hekemian & Company, Inc., and Carlsen. The purpose of this meeting was to discuss the completion of the merger arrangements. After a brief discussion, it was decided Carlsen would draw up new Jaham stock certificates which would be issued directly to the Wilson Co. stockholders. Subsequently, Carlsen drafted by *230 hand two identical groups of stock certificates, one issued by Jaham and one issued by Wilson Co., back-dated to February 10, 1950, and both consisting of 45 shares of stock issued to the following persons in the following amounts: Preston and Maud Wilson
14.53 shares
Samuel and Elizabeth Hekemian
21.97 shares
John and Alice Aslanian
7.44 shares
Jacob and Ann Hammalian
1.06 shares All of these certificates were signed by Preston Wilson as president of the respective corporations and by Elizabeth Hekemian as secretary-treasurer of the corporations. Each was stamped with its respective corporate seal. However, these certificates were never actually received by the designated shareholders and remained undelivered. In November of 1952, Carlsen having done nothing further on the merger arrangements, Samuel Hekemian and his counsel, Milton Najarian, turned the entire merger matter over to new counsel, Samuel Foosaner and G. Norman Widmark, of Newark, New Jersey, tax specialists whom Hekemian had initially consulted on family estate planning problems. As a result of a series of conferences among Widmark, Hekemian, and Najarian, early in 1953 Widmark drafted minutes *231 of both Wilson Co. and Jaham stockholder and board of directors meetings which he was informed had informally taken place late in 1949 and early in 1950 in preparation for the Oppenheim Collins lease and the merger of the two corporations. Widmark retroactively dated these minutes to 1949 and 1950, using the dates supplied to him by Hekemian and Najarian as the dates when the various preliminary decisions were made. Under date of February 10, 1950, Widmark drafted minutes of a Wilson Co. board of directors meeting (and similarlyworded minutes for Jaham's board (which referred to the pre-conveyance arrangements and understandings as follows: Until now, the officers of this company and the Jaham officers have not decided on a definite plan for this merger of interest. Because of time limitations and the necessity to execute the lease contract immediately, it has been proposed that this company convey its land to the Jaham Holding Company, Inc. under a trust agreement, with the understanding that adequate provision will be made at some later date to adjust the interest of the two corporations. It is presently contemplated that the Jaham company will issue shares of its capital stock *232 to this company or to our shareholders as payment for the conveyance, but the exact details of such stock issuance have not been discussed. In addition to drafting corporate minutes to document the pre- and post-conveyance decisions, Widmark also had the stock certificates drafted by Carlsen officially voided as "not issued, prepared in error", and he drafted and actually issued an entirely new group of Jaham stock certificates. Widmark reissued the 45 shares of Jaham stock to the Jaham stockholders of record as of February 10, 1950, and, in addition, issued 82 new shares of Jaham stock dated February 10, 1950, to the Wilson Co. stockholders of record as of February 10, 1950, in proportion to their stock interests in Wilson Co. at the time of the conveyance. As a result, the Jaham stock on April 1, 1953, was distributed as follows: Shareholder of Record
Shares
Percentage
Maud Wilson
5.29
4 1/6
Preston Wilson
35.71
28 1/6
Laurence Investment Co., Inc.
35.71
28 1/6
Elizabeth Hekemian
5.29
4 1/6
John and Alice Aslanian
21
16 3/6
Samuel Hekemian
21
16 3/6
Jacob Hammalian
3
2 2/6
127
100 Under this arrangement, the Wilson Co. stockholders *233 were given slightly less than a two to one stock interest in Jaham as compared to the original Jaham stockholders on February 10, 1950. After the new Jaham stock issue had been received by the Wilson Co. stockholders, each stockholder turned in his Wilson Co. stock to Wilson Co. which cancelled the stock and then issued three shares of stock as its total outstanding stock. These three shares were issued one each to Maud and Preston Wilson and Elizabeth Hekemian. Neither Wilson Co., Jaham, nor the Wilson Co. stockholders, Preston Wilson and Laurence, declared any gain or loss on the merger of Wilson Co. and Jaham on their respective 1950 income tax returns. Wilson Co. reported the transfer of its real property to Jaham on Schedule D of its corporate return indicating that no gain or loss was realized as a result of the transfer. The Commissioner has determined that Wilson Co. realized a gain of $208,772.67 on the sale of its property to Jaham in 1950 and that Preston Wilson and Laurence received taxable dividends of $104,386.33 and $104,386.34 respectively in 1950 from Wilson Co. when they purportedly received stock interests in Jaham. The Commissioner determined the dividends on *234 the basis of the Carlsen-drafted Jaham stock certificates. Since Laurence received no allocation under the Carlsen scheme, the Commissioner determined that Laurence constructively received the stock interest allocated to its shareholder, Samuel Hekemian, and thereby constructively received the dividend in question. 2. Expenses claimed by Jaham. (a) Deferred leasehold expense. On its 1950 corporate income tax return, Jaham began the amortization of $29,000 as "commissions on 30 year lease". Thus, it claimed $718.75 as the "amortization of leasehold expense" for the year 1950. On December 31, 1951, Jaham entered on its books of account a new account called "Deferred Leasehold Expenses" in the amount of $468,000 "Due to Stockholders." The same day an entry was made showing one-thirtieth of the new account or $15,600 as the currently accrued leasehold expense for 1951. On its 1951 corporate income tax return, Jaham added the new deferred leasehold expense account to the unamortized portion of the prior leasehold expense account and took one-thirtieth of the total or $16,566.67 as its "amortization of leasehold expenses" for 1951. The Commissioner has disallowed $15,600 of this *235 amount. On January 2, 1952, Jaham issued notes payable in the aggregate amount of $15,600 for the purpose of paying the leasehold expenses accrued on its books at the end of 1951. These notes were issued as follows: Preston Wilson
$ 5,037.40
S. Hekemian & Company, Inc.
7,615.29
John Aslanian
2,578.68
Jacob Hammalian
368.63
$15,600.00 These notes were in accordance with the proportionate ownership interests in Jaham created by the Carlsen-drafted Jaham stock certificates, with the exception that Samuel Hekemian's proportionate interest was made payable to his company S. Hekemian & Company, Inc., instead of to him personally. Jaham's books disclose a journal entry showing "Account Payable - Stockholders" in the amount of $15,600, together with a matching entry of $15,600 as "Notes Payable". Jaham's books during 1951 also show that a total of $2,000 was advanced by the corporation during the year to the Wilsons, the Hekemians, the Aslanians, and the Hammalians, in the exact same proportions as their stock interests under the Carlsen-drafted stock certificates. On December 31, 1952, the entry which had put the new deferred leasehold expense account on Jaham's *236 books a year earlier was reversed, eliminating the remaining $452,400 which stood in the account. This reversing entry was made at the suggestion of G. Norman Widmark, Samuel Hekemian's new tax counsel. However, the $15,600 leasehold expense accrued in 1951 was not reversed, and the corporation's notes which were issued to pay this amount were actually paid between 1952 and 1954. The $15,600 leasehold expense was accrued by Jaham in 1951 purportedly for the purpose of compensating those persons who had been especially instrumental in securing the profitable Oppenheim Collins lease for the corporation. The alleged services were performed in 1949 and 1950, immediately before and after the signing of the lease, and largely involved arranging the merger of Wilson Co. and Jaham and relocating the tenants in the buildings which Oppenheim Collins intended to demolish for the construction of its new department store. The entry of $468,000 as a deferred liability for this purpose was improper; no such amount was then owed by Jaham, nor was there any basis in fact that would justify an anticipated expenditure in the future in any such amount. At the hearing of this case and on brief, Jaham *237 conceded that the entire $15,600 was improperly deducted in 1951 and now contends that it should be allowed to amortize that amount over the term of the lease, $520 in 1951 and each of the years in issue thereafter. The $15,600 which Jaham accrued as a leasehold expense on its books in 1951 is not a valid expense in obtaining or maintaining the lease with Oppenheim Collins. There was no agreement or understanding that any such amount or any other amount would be paid for the alleged services. No such services of consequence were rendered by Preston Wilson, John Aslanian or Jacob Hammalian. The amount in question was not paid in proportion to services rendered in connection with that lease but was paid in exact proportion to the ownership of Jaham stock as it was understood to be at the time. It was not in fact intended as a payment for services. However, Jaham's deduction of the $15,600 on its 1951 tax return was not due to fraud with intent to evade tax. (b) Officers' salaries and management fees. During 1950 and 1951, Jaham accrued no officers' salaries or other compensation expenses on its books other than the $15,600 leasehold expense noted above in 1951. During the year *238 1952 Jaham accrued officers' salaries in the following amounts: Preston Wilson, $2,500; John Aslanian, $1,500; Jacob Hammalian, $500; and Elizabeth Hekemian, $500. In addition, a "service fee" was accrued to the account of Samuel Hekemian in the amount of $1,000. All of these amounts were paid by check on March 13, 1953. During the year 1953, Jaham accrued the following officers' salaries on its books: Preston Wilson, $1,500; John Aslanian, $500; Elizabeth Hekemian, $500. These salaries were paid by check on January 18, 1954. In addition, Jaham accrued a service fee of $1,000 to Samuel Hekemian and a management fee of $2,039.37 to S. Hekemian & Company, Inc. These amounts were paid by check on January 18, 1954, and April 13, 1953, respectively. The service fees in 1952 and 1953 to Samuel Hekemian and the management fee in 1953 to S. Hekemian & Company, Inc. were paid primarily for services performed for the corporation in attempting to improve the parking facilities near the Oppenheim Collins department store. These efforts included negotiating with nearby landowners in an attempt to enlarge the existing parking facilities and finding parking spaces for the employees of Oppenheim *239 Collins across the street from the department store so that the employees would not use the limited customer parking facilities available. Since Jaham's lease with Oppenheim Collins provided for additional percentage rent based on sales in excess of $1,000,000 per annum, Jaham had a special interest in doing everything possible to improve its tenant's customer parking problem. The Commissioner disallowed the officers' salaries and management and service fees claimed by Jaham in its 1952 and 1953 income tax returns "as being neither ordinary nor necessary business expenses". The service fees to Samuel Hekemian and the management fee to S. Hekemian & Company, Inc., were ordinary and necessary business expenses. The officers' salaries were not ordinary and necessary business expenses. (c) Interest. Jaham accrued interest expense in the amount of $915.25 in 1952 and $623.14 in 1953 on notes to its officers and employees. The interest accrued in 1952 was on the notes which were issued in 1952 to pay the $15,600 leasehold expense accrued in 1951. This interest was paid on March 13, 1953. The interest accrued in 1953 was in part based on some of the same notes which remained outstanding *240 during 1953 and in part based on loans which were made to Jaham according to its books by Samuel Hekemian, John Aslanian, and Jacob Hammalian. All of the interest accrued in 1953 was paid on March 10, 1954. The Commissioner disallowed interest expense claimed by Jaham in 1952 in the amount of $915.25 and in 1953 in the amount of $623.14 "for lack of proper substantiation". (d) Depreciation on Oppenheim Collins Department Store. On its income tax returns for 1951, 1952, and 1953, Jaham deducted depreciation on the Oppenheim Collins Department Store building in the amount of $7,095.37 each year. It calculated its cost basis of the building to be $212,861.17, which included the following components: $150,000 cash contributed to Oppenheim Collins for construction; $8,164.40 book value of old Jaham building incorporated in new building; $48,333.27 book value of old Wilson Co. building incorporated in new building; $6,363.50 legal and miscellaneous costs applicable to construction. Jaham used 30 years, the term of the Oppenheim Collins lease, as the estimated life of the building to arrive at the annual depreciation charge of $7,095.37. The Commissioner disallowed $4,109.07 of depreciation *241 expense claimed by Jaham in each of the years 1951, 1952 and 1953 "as being excessive". Jaham contributed $150,000 in cash toward the construction of the Oppenheim Collins building. In addition, it spent $6,363.50 on legal fees and miscellaneous expenses associated with the construction of the building. The amounts of undepreciated bases of the portions of the two old buildings which were incorporated in the Oppenheim Collins building in 1950 were $8,164.40 and $48,333.27. The useful life of the Oppenheim Collins building is 50 years. 3. Laurence Investment Co., Inc. On February 25, 1935, for a recited consideration of $20,000, Laurence acquired title to property at 305 Main Street, Hackensack, New Jersey, by Sheriff's Deed. The deed was recorded on February 27, 1935, in the Office of the County Clerk, Bergen County, New Jersey. The particular property involved had originally been acquired jointly by Samuel and Elizabeth Hekemian and John and Alice Aslanian in 1930. Title was held in the names of Samuel Hekemian and John Aslanian. Foreclosure proceedings had been initiated in 1934 by a group of creditors and were finally resolved by the Sheriff's Deed conveying title to Laurence *242 in 1935. In July of 1935, Laurence passed a corporate resolution and its president signed a declaration of trust which together recited that the 305 Main Street property had been purchased by the corporation "with monies furnished by" the Hekemians and the Aslanians and that therefore it was recognized that Laurence "holds said premises in trust" for John and Alice Aslanian and Samuel and Elizabeth Hekemian. It was agreed in the declaration of trust that Laurence would collect rents and profits from the property and pay the expenses, being accountable to the beneficiaries and subject to their supervision. The declaration of trust was not recorded by Laurence. The books of account of Laurence from 1935 to 1953 do not reflect any income or expenses associated with the 305 Main Street property. The firm of S. Hekemian & Company, Inc. actually managed the property during all of these years, received all rents, and paid all expenses connected with the property. In 1940 Samuel Hekemian filed a voluntary petition in bankruptcy and was discharged in the same year. In the inventory of his property which he swore was accurate and true to the best of his knowledge, he listed no interest *243 in the 305 Main Street property. He also failed to list any stock interest in Laurence Investment Co., Inc. In November of 1950 Laurence borrowed $35,000 from the New Jersey Realty Company. At that time Laurence represented that it owned the 305 Main Street property and secured the loan by mortgaging this property. As of January 1, 1953, Laurence placed the 305 Main Street property on its books of account for the first time. It did so by debiting land and building, $31,970.64, crediting reserve for depreciation, $16,125.00, crediting mortgages payable, $27,325.55, and crediting earned surplus, $33,982.50. From 1935 through 1950, Laurence declared no income on its corporate income tax returns from the 305 Main Street property, nor did it file a fiduciary income tax return in regard to this property in any of the years in question. As filed, Laurence's income tax returns showed a net operating loss in every year from 1935 through 1942 and a net operating gain in every year from 1943 through 1950. In his deficiency notice, dated July 24, 1957, the Commissioner determined that Laurence failed to report net rental income from the 305 Main Street property in every year from 1935 *244 through 1950 and determined a deficiency in each year based on the unreported income. He also determined 50 per cent additions to tax on the ground that each deficiency is due to fraud with intent to evade tax. Further, from 1935 through 1945, the Commissioner has determined excess profits tax and declared value excess profits tax deficiencies and additions to tax based on the unreported income from the 305 Main Street property. Laurence has pleaded the statute of limitations to bar the Commissioner's determinations. In computing the net annual income from the 305 Main Street property from 1935 through 1950, the Commissioner allowed no depreciation deduction. Laurence and the Commissioner have stipulated that for purposes of computing net rental income from this property a depreciation deduction shall be allowed based on a useful life of the building of 33 1/3 years. The cost basis of the building is not greater than $20,000. Laurence was the owner of the property at 305 Main Street from February 25, 1935, through the year 1950 and failed to report the net rental income from this property in its corporate income tax return in each year from 1935 through 1950. Its failure to report *245 the net rental income from the 305 Main Street property in each of the years was due to fraud with intent to evade tax. Opinion RAUM, Judge: The record before us is far from satisfactory. There is confusion in respect of some of the issues, and the evidence presented was of such character in various instances as to make it difficult, if not impossible, to piece together an intelligible and consistent account. We must nevertheless do the best we can with the materials before us, with due regard for the burden of proof. 1. Merger of Wilson Co. and Jaham. The first question which must be decided is whether the scheme under which Jaham acquired substantially all the assets (the land and building at 320-322 Main Street, Hackensack, New Jersey) of Wilson Co. in 1950 and subsequently the Wilson Co. stockholders received slightly less than two-thirds of Jaham's outstanding voting stock qualifies as a tax-free, C-type reorganization under the applicable provisions of the 1939 Code. [2] The petitioners contend that an assets-for-voting-stock reorganization has been proved which meets the statutory non-recognition requirements of Sections 112(b)(4) and 112(g)(1)(C). [3] The Commissioner *246 has determined the statutory requirements have not been met and that there was a taxable sale rather than a reorganization followed by the distribution of a taxable dividend. We are of the opinion that petitioners have met the statutory test for a tax-free reorganization. *247 There is no dispute that Jaham acquired "substantially all the properties" of Wilson Co. by the conveyance of the Main Street properties on February 10, 1950. The disputed issues are whether this conveyance and the subsequent issuance of Jaham stock to the Wilson Co. stockholders was done in pursuance of an existing "plan of reorganization" as required by Section 112(b)(4) and, if there was such a plan, whether it envisioned an exchange solely for voting stock of Jaham as required by the statutory definition of a reorganization in Section 112(g)(1)(C). Apart from these questions, the Commissioner additionally attacks the reorganization based on the premise that the Carlsen-drafted Jaham stock certificates were in fact issued and received as a part of the reorganization in violation of the so-called "continuity of interest" doctrine and without an exchange of Wilson Co. stock. He also contends that petitioners' failure to comply with the existing regulations requiring the Commissioner be informed of the consummated reorganization is a "further indication that the transaction was a sale and not a reorganization." The phrase "plan of reorganization" is not explicitly defined in the *248 statute. The Regulations define it only in reference to transactions designed to accomplish a reorganization as defined in Section 112(g)(1). [4] The Commissioner on brief concedes that the plan "need not be in any particular form", and it has been held that a plan of reorganization need not necessarily be reduced to writing. Transport Products Corporation, 25 T.C. 853, affirmed per curiam, 239 F. 2d 859 (C.A. 6); James G. Murrin, 24 T.C. 502; Hortense A. Menefee, 46 B.T.A. 865; William H. Redfield, 34 B.T.A. 967; Edison Securities Corporation, 34 B.T.A. 1188; cf. Manning, "In Pursuance of the Plan of Reorganization": The Scope of the Reorganization Provisions of the Internal Revenue Code, 72 Harv. L. Rev. 881, 910-917 (1959).
We are satisfied on this record that the various steps taken to merge Wilson Co. and Jaham were taken pursuant to a "plan of reorganization." The shareholders of the two corporations met together several times late in 1949 and early in 1950 for the very purpose of agreeing upon such a merger plan. They needed to combine *249 the properties of the two corporations into one or the other corporation as a prerequisite to obtaining the Oppenheim Collins lease. Their agreement on the procedure to be followed was not put into written form, but three separate witnesses (Preston Wilson, Samuel Hekemian, and Milton Najarian) who attended these meetings testified that it was agreed that Wilson Co. would transfer its property to Jaham and receive Jaham stock in return. Although it is obvious this plan was not worked out in every detail regarding the exact amount of stock which would necessarily be involved, the same witnesses testified that it had been agreed that the Wilson Co. shareholders would end up with approximately two shares of Jaham stock for every one held by the Jaham shareholders prior to the merger. We think these broad agreements on an assets-for-stock corporate combination show that a "plan of reorganization" had been adopted prior to the transactions under consideration. The Commissioner, however, argues that no plan as such had been worked out, that the minutes that were retroactively drawn up in 1953 covering the pre-conveyance meetings prove no agreement was reached on the method of compensation, *250 and the trust receipt drafted by the attorney Carlsen in March of 1950 after the conveyance is further proof that a stock transfer had not been agreed upon as the only method of adjusting the interests of the parties. We agree that the corporate minutes drawn up in 1953 and back-dated to late 1949 and early 1950 are not as detailed regarding the merger plan as were the witnesses who testified at the hearing of this case. But we are not of the opinion that these minutes, the information for which Widmark obtained from two of the same persons (Hekemian and Najarian) who testified in the instant proceedings, are inconsistent with the plan as the witnesses have described it. Both the Jaham and the Wilson Co. minutes under date of February 10, 1950, indicate the details of the merger as of that date were still somewhat indefinite, but both show that a general plan including an exchange of Wilson Co. assets for Jaham stock had been agreed upon prior to the conveyance of the Wilson Co. properties. The trust receipt drafted on March 15, 1950, more than a month after the conveyance, by the attorney Carlsen (who had not taken part in the pre-conveyance conferences) does state that the corporations *251 "have not as yet determined the basis upon which payment shall be made" for the Wilson Co. properties and refers to "compensation to be paid either in stock or in cash for the conveyance of said titles to Jaham". This is the only evidence that cash was ever considered as a means of paying for the Wilson Co. assets. Milton Najarian testified that cash never was so considered. Presumably Carlsen's inclusion of "or in cash" was due either to Carlsen's misunderstanding or possibly overcaution in case the preliminary plans might be changed. We do know that cash was in fact never paid to Wilson Co. or its stockholders, and we reject the Commissioner's contention that the inclusion of "or in cash" in the trust receipt by an attorney who never took part in the planning of the merger proves that an exchange solely for voting stock was not firmly planned and agreed upon. The Commissioner has also attacked the reorganization here based on his requested finding of fact that the Jaham stock certificates drafted by Carlsen in 1951 were actually issued and received by the persons named on those certificates as a part of the carrying out of the merger plans. The Commissioner called an expert witness, *252 an examiner of questioned documents, who testified that one of these Jaham stock certificates had been receipted for by Preston Wilson's signature but that this signature was subsequently erased from the receipt form. The same witness testified that none of the other Carlsen-drafted Jaham certificates showed any evidence of having been receipted for, but the certificate which had the erased receipt form and one other had apparently been folded at one time or another. Notwithstanding this evidence, we conclude without strong conviction, on the basis of testimony of three other witnesses, that the Carlsen-drafted certificates were not actually received by the designated stockholders, and they were subsequently voided by Widmark as "prepared in error". It is nevertheless true that the $15,600 so-called "leasehold expense" which was accrued on Jaham's books for 1951 and the $2,000 advances to shareholders made by Jaham in 1951 were both divided among the Jaham shareholders according to the interests created by the Carlsen plan, so it is obvious that these undelivered certificates were accepted by Jaham for some operating purposes as at least a temporary, de facto division of equities. *253 But it appears from the entire record that the Carlsen-drafted certificates were never accepted as anything more than an interim measure, and it was not until Widmark drafted an entirely new set of certificates early in 1953 that the reorganization was in fact completed to the satisfaction of those who had originally conceived and planned it. Since we are unable to accept the Commissioner's premise that the Carlsen-drafted certificates completed the merger of the corporations, we need not discuss the arguments which the Commissioner makes based on this premise that the "continuity of interest" doctrine was thereby violated and a non-statutory "spin-off" took place. Suffice it to say that he does not make the same arguments against the Widmark-drafted issue of stock which we have found was the concluding transaction in the reorganization. The reorganization as we view it then began on February 10, 1950 when Wilson Co. conveyed its properties to Jaham and was not completed until early in 1953 when Jaham issued its stock to the Wilson Co. stockholders who thereupon had their Wilson Co. stock cancelled. Does this lapse of three years' time prevent the reorganization from qualifying *254 as a statutory C-type reorganization? We do not think so. Neither the statute nor the regulations set any time limit within which the reorganization transactions must be completed. In D. W. Douglas, 37 B.T.A. 1122, the lapse of five years' time from the beginning of the reorganization in 1928 until its completion in 1933 did not prevent a reorganization from coming within a statutory definition similar to the one here in issue. The mere lapse of time is not decisive. The important thing is that the steps which are taken evidence a consistent performance of the reorganization plan and purpose. Cf. Chester E. Spangler, 18 T.C. 976; W. N. Fry, 5 T.C. 1058; Philip W. McAbee, 5 T.C. 1130; Hortense A. Menefee, 46 B.T.A. 865; D. W. Douglas, supra.The distribution in 1953 of the 82 shares of Jaham stock among the Wilson Co. shareholders in direct proportion to their Wilson Co. holdings, followed by the cancellation by Wilson Co. of its stock, [5] was done pursuant to the original plan of reorganization adopted early in 1950, and under the provisions of Section 112(b)(3) [6] no gain is recognized on these final transfers *255 and exchanges. [7]
*256 We now turn to the Commissioner's final reason for determining there was no taxfree reorganization on these facts, namely, that the petitioners failed to comply with the existing regulations requiring that he be fully informed of the consummated reorganization. We have set forth the applicable regulations in the margin. [8] While we do not understand the Commissioner as making the extreme argument that the mere failure to comply with the notice-giving provisions of this regulation automatically disqualifies a reorganization which otherwise meets the statutory requirements from qualifying as a tax-free reorganization, he does contend that this failure by all the parties to the purported reorganization in the instant proceeding is a "further indication that the transaction was a sale and not a reorganization." However, even after giving due weight to this consideration we still conclude that there was a reorganization within the meaning of Section 112(g)(1)(C). *257 Because of our conclusion that the petitioners have proved that a C-type, assets-for-voting stock reorganization occurred, we need not decide whether any gain would have been realized by the parties to the reorganization if the statutory requirements had not been met. The Commissioner's determination of deficiencies against petitioners Wilson Co., Preston Wilson, and Laurence, in so far as they are based on a determination of gain realized from the merger transactions, are disapproved. It follows that the additions for fraud determined by the Commissioner on the same parties based on their failure to declare any gain on the merger transactions must also be disapproved. 2. Jaham's Disallowed Deductions. (a) Deferred Leasehold Expense. On its 1950 return Jaham took a $718.75 deduction as "amortization of leasehold expense" based upon a proportionate amount of $29,000 "commissions on 30 year lease". No question is here presented as to the propriety of that deduction or of corresponding deductions for the later years here involved to the extent that they relate to amortization of those commissions. However, there is here in issue a similarly labeled but entirely different item with *258 a confusing history. As of the end of 1951 Jaham set up on its books a totally new account (in addition to the $29,000 commissions) in the amount of $468,000 "due to stockholders" as "deferred leasehold expenses", and included one-thirtieth ($15,600) of the new account as part of the leasehold expense deduction in its 1951 return. The Commissioner disallowed the entire $15,600 as a deduction. We have found that the $468,000 account was improperly entered upon Jaham's books as a deferred liability, that no such amount was then owed by Jaham, and that there was no basis in fact that would justify an anticipated expenditure in the future in any such amount. Indeed, Jaham conceded at the hearing that the $15,600 was improperly deducted in 1951, but contends that there is a valid basis for treating $15,600 as a leasehold expense, and it asks that it be permitted to amortize that amount over the term of the lease, claiming a deduction in the amount of $520 for 1951. We hold that it has failed to show that it is entitled to any deduction based upon the $15,600 item. The evidence shows that on January 2, 1952, Jaham issued notes in the aggregate amount of $15,600 to Preston Wilson, S. *259 Hekemian & Company, Inc., John Aslanian and Jacob Hammalian in the exact proportion of the division of the Jaham stock pursuant to the then uncompleted Carlsen plan, except that Samuel Hekemian's proportionate share was made payable to his company, S. Hekemian & Company, Inc., rather than to him personally. Although we heard testimony that the notes were intended as compensation for services rendered in connection with the lease, we do not believe it. Upon the basis of the entire record we conclude that the amounts in question were intended merely as a distribution of corporate funds to those who controlled its affairs, in proportion to their equitable interests in the corporation as they were then understood to exist. Although some services may have been rendered by Hekemian's company, no services of consequence appear to have been rendered by any of the others, and in our judgment this item was not in fact intended as bona fide payment for leasehold services; it was merely a distribution of corporate profits. The Commissioner has determined an addition for fraud in connection with this item. There is, to be sure, an odor of fraud about this alleged leasehold expense, and on the *260 merits we have decided that no deduction is allowable in connection therewith. Nevertheless, fraud must be proved by clear and convincing evidence, and we are not satisfied that the Commissioner has carried his burden in this respect. We accordingly disapprove the addition for fraud. Cf. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6). (b) Officers' salaries and management fees. The Commissioner disallowed deductions for officers' salaries accrued by Jaham as follows: for 1952, Preston Wilson, $2,500, John Aslanian, $1,500, Jacob Hammalian, $500, and Elizabeth Hekemian, $500; for 1953, Preston Wilson, $1,500, John Aslanian, $500, and Elizabeth Hekemian, $500. In addition he also disallowed deductions for a $1,000 "service fee" accrued to Samuel Hekemian in 1952 and 1953 as well as a management fee of $2,039.37 accrued to S. Hekemian & Company, Inc. in 1953. The evidence presented to justify these salaries and fees related primarily to efforts to improve the parking facilities near the Oppenheim Collins store. However, we conclude on the evidence that the only services of consequence were rendered by Samuel Hekemian and his company, S. Hekemian & Company, Inc. *261 We approve the deduction of the fees paid to them. On the other hand, there is no convincing evidence that any of the others performed any services on behalf of Jaham calling for compensation. The disallowance of deductions in respect of their salaries must therefore stand. (c) Interest. The Commissioner disallowed interest deductions of $915.25 for 1952 and $623.14 for 1953 "for lack of proper substantiation". However, the evidence shows that these amounts were in fact accrued and paid. Although some question might perhaps be raised with respect to the obligations giving rise to the contested interest deductions, we think that, on the whole, the statutory requirement for deductibility has been satisfied here. (d)Depreciation on Oppenheim Collins Department Store Building. The Commissioner's adjustments as to depreciation of this building raise two issues: the proper basis for depreciation and the life of the building to be depreciated. We agree with Jaham as to basis. The evidence shows that Jaham contributed $150,000 in cash to Oppenheim Collins for construction of the building. Further, there were incorporated into the new building portions of the old Jaham and Wilson Co. *262 buildings. Although there is some conflict in the evidence, we find, in accordance with Jaham's contentions, that the undepreciated basis relating to portions of the old buildings incorporated into the new amounted to $8,164.40 with respect to the old Jaham building and $48,333.27 with respect to the old Wilson Co. building. Also Jaham is entitled to add to its basis $6,363.50 for legal and miscellaneous costs applicable to construction. Jaham is accordingly entitled to a basis of $212,861.17 for depreciation. As to the life of the building, Jaham used a 30-year life in its return, whereas the Commissioner's determination appears to be based upon a 50-year life. In its brief Jaham states that depreciation should be "based on a useful life of 35 or 36 years". There is some evidence in the record to support the latter view, but we do not find it convincing. Pictures of the building are in evidence. It appears to be a modern and substantial structure. We conclude that Jaham has not overcome the correctness of the Commissioner's determination and find that the building has a useful life of 50 years. 3. Laurence Investment Co., Inc. - Income from 305 Main Street. The Commissioner has *263 determined that Laurence was the owner of income-producing property at 305 Main Street, Hackensack, New Jersey, from February 25, 1935, through the calendar year 1950 and that during this entire period Laurence consistently failed to report the income from this property on its Federal income tax returns. The Commissioner has additionally determined that the resulting deficiency in each year from 1935 through 1950 was due to fraud with intent to evade tax, and he has therefore proposed additions to tax for fraud. Laurence does not deny that it held legal title to the property involved, but it argues that it had no equitable or beneficial interest in the property, that it held title as trustee for certain individuals, and that accordingly it realized no income from the property. Even if it should be determined that it was the taxable owner of the 305 Main Street property, Laurence contends that the statute of limitations stands as a bar to the assessments for 1935 through 1949 [9] since it alleges the Commissioner has not proved the income was fraudulently omitted in each of the years in issue with intent to evade tax. *264 We think the Commissioner must prevail here. Laurence was in fact the taxable owner of the property. The contention that it held the property in trust is, we think, based on a sham. The so-called trust agreement was never recorded, no fiduciary returns were ever filed, it obtained a mortgage loan upon the property in 1950, Samuel Hekemian failed to list any interest in the property in his 1940 voluntary petition in bankruptcy, and the evidence strongly suggests that no one reported the income from the property over the years in question. Moreover, the 1953 entries in Laurence's books, after revenue agents had commenced an investigation, were entirely inconsistent with the trust theory. Laurence was no mere corporate shell, and is accountable for the income properly attributable to it. We are satisfied on the evidence that the Commissioner has carried his burden as to fraud, and thus has not only established the basis for the additions due to fraud but also overcome the statute of limitations defense. The amount of the taxable net income from the property for these years is also disputed. Laurence contends that the Commissioner by failing to deduct either depreciation or insurance *265 expense overestimated the net income for each year involved. The parties have stipulated that a depreciation deduction should be allowed based on a useful life of the building of 33 1/3 years, but the basis of the property has not been stipulated. The evidence in respect of Laurence's basis in the property is confusing. Our best judgment on this unsatisfactory record is that Laurence's basis is not more than $20,000 and we have so found as a fact. Since Laurence has offered no proof of any insurance expense other than that already allowed by the Commissioner in the years 1949 and 1950, we have determined that a depreciation charge in each year is the only adjustment required in the Commissioner's determination of Laurence's annual net income from the Main Street property. $ Decisions will be entered for the petitioners in Docket Nos. 69202 and 71026. Decisions will be entered under Rule 50 in Docket Nos. 70407 and 71027. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Laurence Investment Co., Inc., Docket No. 70407; Wilson Holding Company, Docket No. 71026; and Jaham Holding Company, Inc., Docket No. 71027.↩
2. All statutory references herein will be to the Internal Revenue Code of 1939. A "C-type" reorganization refers to the definition of a reorganization set out in Section 112(g)(1)(C). See footnote 3, infra. ↩
3. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(b) Exchanges Solely In Kind. - * * *
(4) Same - Gain of Corporation. - No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization. * * *
(g) Definition of Reorganization. - As used in this section * * * (1) The term "reorganization" means * * * (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, * * *↩
4. Regulations 111, section 29.112(g)-1, -2.↩
5. The facts show that after Jaham distributed its stock directly to the Wilson Co. shareholders, the latter turned in all their Wilson Co. stock to Wilson Co. to be cancelled. However, Wilson Co. was not liquidated, but was kept in existence by the issuance of three qualifying shares, one each to Maud Wilson, Preston Wilson, and Elizabeth Hekemian. There is no statutory requirement that the corporation which transfers substantially all of its assets, here Wilson Co., cannot survive the reorganization, so its continued existence is not inconsistent with a conclusion that a tax-free reorganization has taken place. ↩
6. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(b) Exchanges Solely in Kind. - * * *
(3) Stock for Stock on Reorganization. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. ↩
7. Jaham distributed its stock directly to the Wilson Co. shareholders rather than transferring it to Wilson Co. under Section 112(b)(4) and then allowing Wilson Co. to distribute it among its shareholders in exchange for its own outstanding stock under Section 112(b)(3). When the Wilson Co. shareholders turned in their Wilson Co. stock for cancellation after receipt of the Jaham stock, they in effect made a Section 112(b)(3) exchange of stock, and all parties to the reorganization ended up in the exact same position they would have been in had Jaham issued its stock to Wilson Co. and Wilson Co. then distributed it to its shareholders. Viewing the transactions as a whole, we think there has been substantial compliance with the statutory, nonrecognition provisions.↩
8. Regulations 111, section 29.112(g)-6: Sec. 29.112(g)-6. Records to be kept and Information to be Filed with Returns - (a) The plan of reorganization must be adopted by each of the corporations parties thereto; and the adoption must be shown by the acts of its duly constituted responsible officers, and appear upon the official records of the corporation. Each corporation a party to a reorganization shall file as a part of its return for its taxable year within which the reorganization occurred a complete statement of all facts pertinent to the nonrecognition of gain or loss in connection with the reorganization, including - 1. A certified copy of the plan of reorganization, together with a statement under oath showing in full the purposes thereof and in detail all transactions incident to, or pursuant to, the plan. 2. A complete statement of the cost or other basis of all property, including all stock or securities, transferred incident to the plan. 3. A statement of the amount of stock or securities and other property or money received from the exchange, including a statement of all distributions or other disposition made thereof. The amount of each kind of stock or securities and other property received shall be stated on the basis of the fair market value thereof at the date of the exchange. 4. A statement of the amount and nature of any liabilities assumed upon the exchange. (b) Every taxpayer, other than a corporation a party to the reorganization, who receives stock or securities and other property or money upon a tax-free exchange in connection with a corporate reorganization shall incorporate in his income tax return for the taxable year in which the exchange takes place a complete statement of all facts pertinent to the nonrecognition of gain or loss upon such exchange, including - 1. A statement of the cost or other basis of the stock or securities transferred in the exchange, and 2. A statement in full of the amount of stock or securities and other property or money received from the exchange, including any liabilities assumed upon the exchange. The amount of each kind of stock or securities and other property (other than liabilities assumed upon the exchange) received shall be set forth upon the basis of the fair market value thereof at the date of the exchange. (c) Permanent records in substantial form shall be kept by every taxpayer who participates in a tax-free exchange in connection with a corporate reorganization showing the cost or other basis of the transferred property and the amount of stock or securities and other property or money received (including any liabilities assumed upon the exchange), in order to facilitate the determination of gain or loss from a subsequent disposition of such stock or securities and other property received from the exchange.↩
9. The deficiency notice to Laurence was dated July 24, 1957. The evidence shows that the Commissioner and Laurence had entered into an agreement under the provisions of Section 276(b) extending the time within which the Commissioner could make an assessment of income tax for the taxable year 1950 to and including June 30, 1958, but no such agreement had been made regarding the taxable years from 1935 through 1949.↩